NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOANN JACKSON, | No. C08-03734 HRL |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| JOHN E. POTTER, POSTMASTER GENERAL, | **[Re: Docket No. 12]** |
| Defendant. | |

Plaintiff Jo Ann Jackson sues her former employer for alleged race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. She claims that throughout her employment with the U.S. Postal Service, she suffered multiple acts of race discrimination and then was fired for complaining about it. Defendant moves for summary judgment. Plaintiff opposes the motion. Upon consideration of the moving and responding papers,[1] as well as the arguments of counsel, this court grants the motion in part and denies it in part.[2]

---

[1] After the motion hearing, without leave of court and in contravention of Civil Local Rule 7-3(d), plaintiff filed a supplemental brief and exhibit. This court does not condone the failure to comply with the rules and warns plaintiff against future non-compliance. Nevertheless, the court has accepted and considered the belated filing, as well as defendant's supplemental opposition papers.

[2] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned.

**I. BACKGROUND**

Except as otherwise indicated, there is no material dispute as to the following facts:

Jackson, an African-American, was employed by the U.S. Postal Service ("USPS") as a Rural Carrier Associate ("RCA") from August 2006 to December 2007. RCAs are not "career" postal employees. Rather, they fill in when regular route carriers are unavailable. RCAs are entitled to work only one day per week, but may be scheduled for additional days of work when the regular route carrier is absent. (See Parra Decl. ¶ 2).

Years before her employment with USPS, when Jackson was in high school, she was involved in a physical altercation with another student. Although she was supposed to appear in juvenile court on the matter, she did not do so.

Later, during a traffic stop in May 1995 (when plaintiff was about 20 years old), the Richmond police reportedly discovered an outstanding warrant for her arrest for her failure to appear in juvenile court. Jackson was arrested and spent two days in jail. She subsequently was brought before a judge in the juvenile division of the Contra Costa County Superior Court. At that hearing, Jackson admitted to the allegations of the petition, and the petition was "sustained as to all counts." (Scharf Decl., Ex. C). When plaintiff informed the court that she had spent two days in jail, she was released on time served. (Id., Ex. B (Jackson Depo. 70:21-24) and Ex. C).

Fast forward about eleven years — on July 13, 2006, Jackson filled out an application for employment as an RCA with USPS. One of the questions (Question 7a) on the application asks:

> Have you ever been convicted of a crime or are you now under charges for any offense against the Law? ***You may omit*** (1) any charges that were dismissed or resulted in acquittal; (2) any conviction that has been set aside, vacated, annulled, expunged, or sealed; (3) ***any offense that was finally adjudicated in a juvenile court or juvenile delinquency proceeding***; and (4) any charges that resulted only in a conviction of a non-criminal offense. All felony and misdemeanor convictions and all convictions in state and federal courts are criminal convictions and must be disclosed. Disclosure of such convictions is required even if you did not spend any time in jail and/or were not required to pay a fine.

(Scharf Decl., Ex. D) (emphasis added).  At the time Jackson filled out this application, she was also given a document titled "Important Notice to Postal Applicants," which advised job-seekers that applications must be filled out accurately, and further provided that "[i]f it is later determined that elements of any employment documents have been answered falsely, you are subject to removal from the Postal Service." (Scharf Decl., Ex. D).  In particular, the notice advised applicants to "pay special attention to [Question 7a on the job application]" and noted:

- You must include all convictions, whether they occurred in the United States or another country.

- Payment of a fine is stipulation of guilt and is considered a conviction.

- Forfeiture of collateral are considered a conviction.

- Serving time in jail in lieu of paying a fine is considered a conviction.

- Section E, Item #7 also refers to arrest which might lead to a conviction but has not yet been adjudicated.

- Many applicants are erroneously told that payment of a fine will not count against them.  This may be true in future legal proceeding[s], however, for the purpose of Section E, Item #7 it is a conviction.

- If you have any questions concerning an arrest, it is better to discuss it with the Post Office Personnel staff before employment than to deal with a charge of falsification at a later date.

(Id.).  Plaintiff signed and dated this document under the statement, "I have read and understand this notice" and checked the "No" column in response to the question about prior convictions.  (Id.).  She did not discuss her prior arrest with any USPS personnel.

Jackson says that in or about July 18, 2006, the USPS obtained a report of plaintiff's criminal history from the California Department of Justice.  That document reportedly noted that no criminal history existed for plaintiff.  (See Jackson Decl. ¶ 3).

USPS hired Jackson, and she began working as an RCA with the Oakley Post Office in Contra Costa County on or about August 5, 2006.  (Scharf Decl., Ex. B (Jackson Depo. 39:17-20)).  Some five days later, on August 10, 2006, the FBI generated a report showing that Jackson had been previously charged with fighting in public and violating a court order.  (Scharf Decl. Ex. H).  The report did not show the disposition of the charges.

3

(Id.). The record suggests that the FBI report was sent to USPS in or around August 2006 and placed in Jackson's personnel file.

According to plaintiff, she was subjected to repeated acts of hostility and race discrimination during her employment at USPS. The alleged incidents of discrimination are discussed more fully below; but chief among plaintiff's complaints was that her supervisor, Pete Hurtado (a) scheduled her to work for one day per week (on average) even though plaintiff requested more work time and other RCAs were allowed to work more than one day per week; and (b) did not allow plaintiff to work "clerk side" (i.e. sorting or "throwing" mail) to pick up extra work hours because she allegedly did not know "the scheme" (i.e. information that shows what addresses belong to particular routes), whereas her co-workers who reportedly did not know "the scheme" were allowed to sort mail. Jackson also alleges that Hurtado failed to take appropriate action when two co-workers allegedly made a racist remark in her presence. (Jackson Decl., ¶¶ 7a-h).[3]

Claiming that "the mounting discrimination was too much for me to handle," Jackson filed a grievance with her union in October 2007. (Jackson Decl., ¶ 9 and Ex. A). Hurtado met with the union representative, and a settlement was reached on or about November 10, 2007. (Id.). As part of that settlement, Hurtado reportedly agreed to certain things, including that plaintiff (a) would not be required to learn "the scheme" before sorting mail; (b) would be given equal hours to work "clerk side" as other RCAs and Temporary Rural Carriers ("TRCs")[4]; and (c) would be given the same auxiliary assistance as other RCAs and TRCs on an as needed basis if she was unfamiliar with a route and depending on RCA hours. (Jackson Decl., ¶ 10). Jackson claims that Hurtado

---

[3] At some point, Jackson complained that Hurtado called her and other female employees "honey" or "hon." But she acknowledged in deposition that she asked him one time to stop, and he did. She also acknowledged that calling women "hon" or "honey" had nothing to do with race discrimination and further confirmed that she is not claiming sexual harassment or gender discrimination in this case. (Scharf Decl., Ex. B (Jackson Depo. 169:11-171:17)).

[4] According to plaintiff, TRCs essentially share the same job duties and responsibilities as RCAs. (Jackson Decl., ¶ 4).

4

did not comply with the settlement agreement because he failed to give her auxiliary assistance and did not permit her to sort mail unless she learned "the scheme." (Id., ¶ 11).

On or about November 13, 2007, Jackson filed a formal complaint of discrimination with the USPS' EEO Investigative Services Office. She claims that shortly after, Hurtado retaliated by slashing her hours and then firing her in December 2007.

Defendant denies any unlawful motive or wrongdoing. It contends that Jackson was terminated because Hurtado reasonably believed that she had lied on her employment application by omitting the information about her prior arrest. According to defendant, sometime in early December 2007, Hurtado received for the first time from USPS' personnel service the FBI's investigative report about Jackson, which was generated some eighteen months earlier in August 2006. (Scharf Decl., Ex. E (Hurtado Depo. 17:8-15, 200:14-16)). Hurtado says that he had not previously seen the report and that he did not request it from personnel services. (Id. (Hurtado Depo. at 17:19-24)). He believes that it was sent to him at that time because USPS' personnel service was in the process of shutting down, and employee files were being dispatched to the offices where particular employees were stationed. (Id. (Hurtado Depo. 18:3-9)).

Hurtado says he then investigated the matter and contacted human resources, the USPS' labor relations department, the FBI and the Richmond Police Department. (Id. (Hurtado Depo. 200:14-205:13)). Human resources reportedly stated that the report may have slipped through the cracks; and, in any event, Hurtado claims that human resources and labor relations told him that they could not help him. The FBI reportedly told him that the appearance of the investigative report meant that Jackson probably was convicted. And, Hurtado claims that the Richmond Police Department told him that plaintiff's records were expunged after 10 years, but that Jackson herself should have records showing the disposition of the charges. (Id. (Hurtado Depo. 200:20-201:16; 202:6-14; 202:16-203:23)).

On December 12, 2007, Hurtado met with Jackson, along with Joe Beccera, a Rural Letter Carrier at the Oakley Post Office. (Id. (Hurtado Depo. at 197:22-23)).

5

According to Hurtado, Jackson agreed to Becerra's presence in lieu of the union steward, who was unavailable at that time. (Id. (Hurtado Depo. at 198:9-199:6)). Hurtado says that he gave Jackson one week to produce proof as to the disposition of the charges identified in the FBI report. (Id. (Hurtado Depo. at 198:2-7)).

Hurtado claims that when Jackson failed to provide proof that she had not been convicted, he initiated a just-cause interview on December 21, 2007. Becerra was also present. Although Jackson claims that she was not told that the meeting was a "just cause" interview (Jackson Decl. ¶ 15), she testified that Hurtado informed her that the meeting could lead to her termination. (Scharf Decl., Ex. B (Jackson Depo. 201:11-13); Ex. F; Becerra Decl. ¶ 4)). The parties dispute precisely how that meeting unfolded.

Defendant contends that Jackson waffled when asked about the FBI report — first claiming that she did not disclose the arrest because she did not think it was important and forgot about it, then later asserting that the charges were false and that she was not arrested. (Scharf Decl., Ex. F; Becerra Decl., ¶¶ 5-6). Defendant says that although Jackson was given another chance to provide proof that she was not convicted of the charges on the FBI report, she failed to do so. Defendant contends that Jackson was then terminated for just cause — i.e., for lying on her employment application — on or about December 26, 2007.

Plaintiff claims that she was never informed that she had the right to have a union representative present at the December 21, 2007 meeting. (Jackson Decl., ¶ 15). She denies agreeing to Becerra's presence in lieu of a union representative. (Id.). She contends that when Hurtado asked her about the FBI report, she told him that the report correctly stated that she had been charged, but that she did not lie on her employment application because she had never been convicted. (Id. ¶ 16). She claims that she also explained that the charges in the FBI report concerned a fight she had in high school and her subsequent failure to appear in juvenile court. (Zink Decl., Ex. B (Jackson Depo. at 91:14-92:23)).

On or about December 28, 2007, two days after Jackson was fired, plaintiff says that she obtained a document from the Contra Costa County Superior Court which states that the "court has no record of convictions" for her and further notes that "[a]ny case that we may have had has been purged pursuant to Government Code 68152." (Jackson Decl., ¶ 17 and Ex. B). Hurtado claims that Jackson never showed him the document, but merely came into the post office, waving it in her hand from five feet away. (Zink Decl., Ex. A (Hurtado Depo. 36:14-24)). Plaintiff claims that she presented the document to Hurtado, who nonetheless upheld the decision to fire her. (Id. ¶ 17). The instant lawsuit followed.

Defendant now moves for summary judgment on the ground that Jackson does not have sufficient evidence to establish a prima facie case of discrimination or retaliation. Even if she can establish a prima facie case, defendant contends that Jackson does not have sufficient evidence to show that the reason for her termination is mere pretext.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See FED. R. CIV. P. 56(e)(2); Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must

produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

### III. DISCUSSION

**A.  Disparate Treatment**

Defendant argues that, although Jackson might be able to show that her termination was unfair, she does not have sufficient evidence creating a triable issue that her termination was motivated, in whole or in part, by race discrimination. Here, defendant contends that Jackson has not presented sufficient evidence to establish a *prima facie* case under the McDonnell Douglas[5] framework or to show that the reason for her termination was merely a pretext for discrimination.

Title VII prohibits employment discrimination based on, among other protected classifications, a person's race. 42 U.S.C. § 2000e-2(a). When responding to a summary judgment motion, a plaintiff may proceed by following the McDonnell Douglas framework, or alternatively, may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).

Under the McDonnell Douglas burden-shifting framework, a plaintiff must establish a *prima facie* case of discrimination. See Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006); Vasquez v. County of Los Angeles, 349 F.3d

---

[5]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

8

634, 640 (9th Cir. 2004). To establish a *prima facie* case of discrimination, a plaintiff must offer proof that (1) she belongs to a class of persons protected by Title VII; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated her differently than a similarly situated employee who does not belong to the same protected class as the plaintiff. Cornwell, 439 F.3d at 1028. Establishing a *prima facie* case creates a presumption that the employer's challenged actions were made because of plaintiff's protected classification. Id.

An employer may rebut this presumption by presenting admissible evidence that the challenged employment action was made for a legitimate, nondiscriminatory reason. Id. If the employer does so, the presumption of unlawful discrimination "'simply drops out of the picture.'" Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993)). The burden then shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination. Cornwell, 439 F.3d at 1028-29.

Plaintiff bears the ultimate burden of proving discrimination. In order to survive summary judgment, the burden of proof may be met in two ways: (1) by offering direct or circumstantial evidence that the challenged employment decision was more likely motivated by discrimination or (2) offering direct or circumstantial evidence that the employer's proffered explanation is not credible – i.e. a mere pretext for discrimination. Id. "Because the only issue remaining in a disparate treatment case after the defendant has rebutted the McDonnell Douglas presumption is 'discrimination *vel non*,'" the Ninth Circuit has said that it is not particularly significant whether a plaintiff relies on the McDonnell Douglas presumption or whether he relies on direct or circumstantial evidence of discriminatory intent to meet his burden of proof. Id. at 1030 (quoting McGinest, 360 F.3d at 1123)). Under either approach, a plaintiff must produce some evidence suggesting that the employer's challenged actions were due, in whole or in part, to discriminatory intent. Id.

Although Jackson claims to have "direct" evidence of discrimination, her evidence is entirely circumstantial. See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (stating that "direct evidence," as opposed to "circumstantial evidence," is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption."). It is unclear whether, under Ninth Circuit law, circumstantial evidence must be "specific" and "substantial," or whether a lesser amount of such evidence will suffice.[12] This court need not reach a conclusion as to the requisite level of circumstantial evidence, however, because plaintiff's evidence of discrimination is insufficient under either standard.

### 1. Untimely Allegations

Jackson alleges that on June 16, 2007, Hurtado reportedly refused to honor her requests for time-off for her children's dental appointments and threw her appointment cards at her. (Scharf Decl. Ex. A, ¶ 9a; Ex. I). Defendant argues that this allegation should not be considered because it is time-barred.

"In order to bring a Title VII claim in district court, a plaintiff must first exhaust her administrative remedies." Sommatino v. United States, 255 F.3d 704, 707 (9th Cir. 2001). "Under the Title VII statutory and regulatory scheme, a federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct, and then, if the matter is not resolved, the employee may submit a formal administrative complaint." Id. at 708. "In cases where a plaintiff has never presented a discrimination complaint to the appropriate administrative authority, we have held that the district court does not have subject matter jurisdiction." Id. at 709. However, "the failure to file a timely EEOC administrative complaint is not a jurisdictional prerequisite to a Title VII

---

[12] Compare Cornwell, 439 F.3d at 1030 ("conclud[ing] that in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence") and McGinest, 360 F.3d at 1122 (stating that circumstantial and direct evidence should be treated alike) with Dominguez-Curry, 424 F.3d at 1038 (stating that circumstantial evidence of pretext must be "specific" and "substantial").

10

claim, but is merely a statutory requirement subject to waiver, estoppel and equitable tolling." Id. at 708.

Here, there is no dispute that plaintiff did not contact an EEO counselor until October 23, 2007 – i.e., 129 days after the alleged June 16, 2007 incident. (Scharf Decl., Ex. I). Plaintiff has not provided any basis for the court to find that the apparent untimeliness of her administrative complaint as to this event should be excused or is otherwise subject to tolling. Indeed, she does not address this issue at all. Accordingly, this allegation is time-barred.

### 2. Remaining Allegations

There is no dispute that Jackson belongs to a class of persons protected by Title VII and that she suffered an adverse employment action. And, for present purposes, defendant agrees that plaintiff can probably meet the minimum burden of establishing that she was qualified to be an RCA. However, defendant contends that Jackson does not have sufficient evidence to establish the fourth prong of the *prima facie* case – i.e., that her employer treated her differently than a similarly situated employee outside her protected class.

In deposition, plaintiff identified Mikaylee Saylor, a regular route carrier at the Oakley post office, as the closest comparable employee. (Scharf Decl., Ex. B (Jackson Depo. at 188:10-21)). Jackson contends that she was treated less favorably than Saylor because Saylor allegedly stole USPS property (i.e., a roll of toilet paper) with impunity.[13] However, nothing in the record presented shows that Saylor is a "similarly situated employee" — i.e., one that is similarly situated to plaintiff in all material respects. See Bowden v. Potter, 308 F. Supp.2d 1108, 1117 (N.D. Cal. 2004); see also Vazquez, 349 F.3d at 641 (stating that "individuals are similarly situated when they have similar jobs and display similar conduct."). As noted above Saylor is a regular route carrier (a

---

[13] According to Hurtado's deposition testimony, he saw Saylor walk out of the post office with a roll of toilet paper and asked where she was going with it. Saylor reportedly told him that she had a cold and needed the toilet paper for her runny nose. Hurtado permitted Saylor to take the roll, so long as the roll remained in her vehicle. (Zink Decl., Ex. A (Hurtado Depo. at 141:3-18)).

11

"career" postal employee), whereas Jackson is an RCA (not a "career" postal employee). Nor is there evidence that Saylor engaged in conduct of comparable seriousness to that attributed to plaintiff. See Vasquez, 349 F.3d at 641 (holding that employee was not similarly situated where he "did not engage in problematic conduct of comparable seriousness to that of [plaintiff]"). Even if Saylor was an appropriate comparator, plaintiff admitted in deposition that she did not have any personal knowledge of the circumstances surrounding the allegedly purloined roll of toilet paper nor of Hurtado's subsequent investigation of the matter. (Scharf Decl., Ex. B (Jackson Depo. at 188:22-24, 190:6-19)).

In her opposition, plaintiff now says that all non-African American employees at the Oakley post office are appropriate comparators. Specifically, plaintiff claims that she was treated less favorably than a number of other RCAs, as well as several TRCs. (Opp. at 14). Here, Jackson asserts a raft of allegations which, she says, shows that she was treated differently (primarily by Hurtado) because of her race:

- She suspects that Hurtado hid her keys on one occasion.
- Hurtado scheduled her to work for one day per week (on average) even though she requested more work time and other RCAs were allowed to work more than one day per week.
- Hurtado regularly assigned Jackson's route (Route 10) to other RCAs and Temporary Rural Carriers ("TRCs").
- Hurtado did not allow plaintiff to work "clerk side" (i.e. sorting mail) to pick up extra work hours because she allegedly did not know "the scheme," while her co-workers who reportedly did not know "the scheme" were allowed to work clerk side.
- On one occasion, a co-worker made a racist remark.
- Hurtado hid a tub of her mail on one occasion.

(Jackson Decl., ¶¶ 7a-h).

Some of plaintiff's allegations are based on little more than pure speculation or are simply uncorroborated by the record. With respect to the allegation that Hurtado hid her keys, Jackson acknowledged in deposition that she does not know who hid her keys. (See Scharf Decl., Ex. B (Jackson Depo. at 155:13-156:5)). Her speculation that it was Hurtado is not evidence, much less evidence giving rise to a genuine issue of material fact.

See Forsberg v. Pacific Northwest Bell Telephone Co., 840 F.2d 1409, 1419 (9th Cir. 1988) ("Although courts should use summary procedures judiciously when intent is an issue, purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment."). Plaintiff also argues that her union grievance is evidence of discrimination. Mere allegations of wrongdoing, however, are not evidence of the same.

Nor has Jackson presented evidence establishing that Hurtado scheduled her to work far fewer days than her colleagues or that he regularly assigned her route (Route 10) to other RCAs and TRCs, much less that any decisions as to her work hours were motivated by discriminatory animus. There is no apparent dispute that, between June and November 2007, Jackson was the only African-American RCA at the Oakley Post Office. Nevertheless, defendant has submitted plaintiff's work schedule between July 14, 2007 and November 30, 2007,[14] which shows that (a) Jackson generally worked more than twice per week and (b) for each of those weeks, at least one of her colleagues worked the same or fewer days than she did. (See Scharf Decl. ¶¶ 13-14, Ex. L). Defendant has also presented evidence indicating that plaintiff was not available to work her assigned route (including an extended absence during the week from November 10-16, 2007), did not wish to work on Saturdays, and did not want to provide assistance on other routes which would have provided her with additional work hours. (See Maloney Decl., ¶ 5; Parra Decl., ¶ 5; Scharf Decl., Ex. J and Ex. L at 18). Additionally, defendant points out that during this same period from July 2007 through November 2007, on days when Shavon Price (the regular carrier for Route 10) was absent, Route 10 was assigned to another employee other than Jackson only five times. (See Scharf Decl., Ex. L at 7-9, 18). On those five days when Route 10 was assigned to other employees, the schedules show that:

- during the week of August 25, 2007, Route 10 was assigned to RCA Salinas for one day and to Jackson for five days;

---

[14] The parties advise that, for reasons unknown, the work schedule record for the week of November 3-9, 2007 is missing.

13

|   |   |
|---|---|
| 1 | • during the week of September 1, 2009, Route 10 was assigned to RCA |
| 2 | Salinas for one day and to Jackson for four days; |
| 3 | • during the week of September 8, 2007, Route 10 was assigned to RCA |
| 4 | Martinez for one day, TRC Bacigalupi for one day (while plaintiff worked |
| 5 | Route 8) and to plaintiff for one day; |
| 6 | • during the week of November 10, 2007, Route 10 was assigned to RCA |
| 7 | Beacham for one day and to Jackson for one day, and Jackson herself took |
| 8 | four days off this week. |

(Id.)

Jackson presents no evidence to the contrary. Instead, she asserts that the custom and practice at the Oakley Post Office was to schedule RCAs to work for 3-5 days per week. However, she offers no evidence to substantiate that assertion. She then points to her work schedule for an abbreviated period (i.e., July 14, 2007 to October 6, 2007) and argues that they demonstrate discrimination because she worked, on average, only 3.3 days per week during that time period. (See Jackson Decl., ¶ 8, Ex. D). But she has presented no evidence giving rise to a triable fact issue of any discriminatory animus. The schedules show that during this time period, the regular carrier for Route 10, Shavon Price, was rarely absent, and in October 2007, four new RCAs began working at the Oakley Post Office. (Scharf Decl., Ex. L at 13-20). Even viewing the record in the light most favorable to Jackson, no trier of fact could reasonably conclude that Jackson was singled out with respect to her work schedule on the basis of her race.

Neither has plaintiff presented a triable fact issue as to any race discrimination with respect to working "clerk side" (i.e., sorting mail). Plaintiff claims that between June and November 2007, she asked to sort mail for the purpose of picking up extra hours, but Hurtado refused. Other than a reference to one employee named "Nicole" (Jackson Decl., ¶ 7c), it is not clear what RCAs allegedly were allowed to work "clerk side" despite not knowing the "scheme" for sorting mail. Nor has Jackson provided any indication how she knows that "Nicole" was unlearned as to the "scheme." At any rate, plaintiff's work

14

schedule shows that she was, in fact, allowed to sort mail four times between August 4 and September 8, 2007, during which period two non-African American RCAs never worked "clerk side." (Scharf Decl., Ex. L at 4, 6). Jackson argues that, on the whole, she worked "clerk side" less often than her co-workers. But she has not presented evidence creating a genuine issue of material fact that she worked "clerk side" less often because of her race. Here, she contends that Hurtado must have been motivated by race discrimination because (a) he testified that he did not permit her to work "clerk side" because she had not learned the "scheme" for sorting mail and (b) this was a violation of the settlement of her union grievance. (See Zink Decl., Ex. A (Hurtado Depo. at 189:7-25)). In view of the record as a whole, however, this testimony is insufficient to create a triable issue as to any discriminatory motive in decisions as to who worked "clerk side," much less to suggest that Jackson's subsequent termination was motivated by her race.[15]

Jackson further alleges that Hurtado had a practice of tolerating racially insensitive comments in the workplace. Here, she points to a single incident in which a co-worker, Jose Salgado, allegedly made a racist remark while speaking with another co-worker, Kelly Katrina, about Halloween decorations. Salgado reportedly told Katrina that he could not see a spider on some cobweb decorations because he is color-blind and cannot see the color black, and therefore could not see Jackson, who was standing about eight feet away. Salgado and Katrina then allegedly both laughed. (Scharf Decl., Ex. B (Jackson Depo. at 165:17-167:15, 168:1-15)). Jackson claims that the incident made her uncomfortable and that she reported the incident to Hurtado, but she does not know if he spoke to Salgado or Katrina about it. (Id. at 168:16-18, 171:18-172:1, 173:2-7)). Nonetheless, Jackson also testified that she subsequently told Salgado that she did not have a problem with Salgado. (Id. at 173:8-15)). And, she also testified that she never heard Hurtado use racially inappropriate language. (Id. at 124:24-125:15)).

---

[15] Defendant asserts that plaintiff has not filed an administrative complaint as to Hurtado's alleged failure to comply with the union settlement.

15

Finally, as for the allegation that Hurtado hid her mail tub on one occasion, plaintiff testified that the tub in question contained mail (from someone identified only as "Steve") that she was supposed to deliver. According to Jackson, Hurtado told her that he hid the tub because he did not want Steve to see it sitting at her station. Another co-worker, Michele Kun, reportedly told Jackson that Hurtado told Kun to deliver the tub of mail. (See Scharf Decl., Ex. B (Jackson Depo. at 159-65)). Even viewing the record as a whole and in the light most favorable to Jackson, she has not presented evidence creating a genuine issue of material fact as to the existence of any intent to discriminate on the basis of her race.

Defendant's motion for summary judgment as to this claim is granted.

## B. Retaliation

Jackson maintains that, shortly after she filed her October 2007 grievance, Hurtado retaliated by slashing her hours and then firing her in December 2007. Defendant contends that Jackson does not have sufficient evidence to survive summary judgment as to her retaliation claim.

Title VII prohibits an employer "'from retaliating against an applicant for employment because the applicant has opposed any unlawful employment practice, or has made a charge, testified, assisted, or participated in an employment discrimination investigation or proceeding.'" Lyons v. England, 307 F.3d 1092, 1103 (9th Cir. 2002) (quoting Lam v. Univ. of Hawaii, 40 F.3d 1551, 1558-59 (9th Cir. 1994)); 42 U.S.C. § 2000e-3(a). The same burden-shifting analysis that applies to claims for discrimination also apply to retaliation claims under Title VII. To make a *prima facie* case of retaliation, a plaintiff must establish that she undertook a protected activity under Title VII, her employer subjected her to an adverse employment action, and there is a causal link between those two events. See Vasquez, 349 F.3d at 646.

There is no dispute that Jackson meets the first two prongs of the *prima facie* test. Defendant, however, argues that plaintiff cannot establish the requisite causal link between any protected activity and her subsequent termination. In order to establish

16

causation, Jackson must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for her termination and that, but for such activity, she would not have been fired. See Viliarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002) (citing Ruggles v. California Polytechnic State Univ., 797 F.2d 782, 785 (9th Cir. 1986)).

Here, there is no dispute that the November 2007 filing of plaintiff's formal EEO complaint is "protected activity." And, at oral argument, plaintiff acknowledged that there is nothing in the record to contradict Hurtado's testimony that he did not know about that complaint prior to Jackson's termination. (See Second Scharf Decl., Ex. B (Hurtado Depo. at 246:20-247:4)). As for Jackson's October 2007 grievance, of which Hurtado indisputably was aware, defendant argues that the grievance is not "protected activity." Grievances for simple contractual violations of collective bargaining agreements do not constitute "protected activity." "To constitute a 'protected activity,' a complaint, grievance, or claim must oppose Title VII violations." Stucky v. Hawaii Dep't of Education, No. 06-00002 JMS/LEK, 2007 WL 602105 *4 (D. Hawai'i, Feb. 15, 2007) (citing Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988)). Defendant contends that nothing in plaintiff's grievance suggests that she was challenging a Title VII violation. (See Jackson Decl., Ex. A). However, plaintiff has presented what appears to be a November 9, 2007 letter (reportedly produced by defendant as part of its initial disclosures) from the USPS EEO specialist, indicating that (a) Jackson filed a claim of race discrimination on October 23, 2007 and (b) Hurtado responded to that claim on November 7, 2007. (Zink Suppl. Decl., Ex. A).

Defendant maintains that there is no evidence that but for the filing of Jackson's complaints, she would have been retained. However, the record indicates that Jackson had continued to be employed by USPS for about eighteen months, notwithstanding the FBI's August 2006 report about her prior arrest. Thus, a reasonable jury could question whether Jackson would have been retained, but for the filing of her grievances and complaints.

17

Defendant articulates a legitimate, non-retaliatory reason for its conduct. It says that any reduction in Jackson's work hours was due to the fact that several new RCAs began working in October 2007. (Scharf Decl., Ex. E (Hurtado Depo. at 227:14-19) and Ex. L). Additionally, defendant says that (a) Jackson has not presented evidence establishing that Hurtado knew that she had no convictions when he fired her; and (b) under the circumstances presented, Hurtado honestly believed that Jackson had falsified her employment application.

As discussed above, Jackson has not presented evidence sufficient to create a genuine issue of material fact that decisions as to her work hours were discriminatory. Nor has she presented evidence creating a triable issue that decisions as to her work hours were retaliatory. Nevertheless, as to her termination, there are material fact disputes as to what transpired during the December 21, 2007 just cause interview. Moreover, viewing the record as a whole and in a light most favorable to plaintiff, this court finds that given the relatively close temporal proximity between the filing of Jackson's October 2007 grievance and her December 2007 termination, Hurtado's knowledge of Jackson's October 2007 grievance, and the fact that Jackson continued to be employed (for whatever reason) despite the FBI's report as to her prior arrest, a reasonable jury could question whether Jackson's termination was prompted, at least in part, by retaliatory motives.

Accordingly, summary judgment as plaintiff's claim of retaliatory discharge is denied.

### IV. ORDER

Based on the foregoing, IT IS ORDERED THAT:

1. Defendant's motion for summary judgment is GRANTED as to plaintiff's claim of race discrimination and DENIED as to plaintiff's claim of retaliatory discharge.

2. A status conference is set for **February 2, 2010, 1:30 p.m.** for the purpose of discussing new dates for the final pretrial conference and trial. The parties shall file a

18

joint status report no later than **January 26, 2010**.

Dated: January 12, 2010

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

**5:08-cv-3734 Notice has been electronically mailed to:**

James A. Scharf james.scharf@usdoj.gov, mimi.lam@usdoj.gov

Trevor Joseph Zink tzink@omnillp.com

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.